UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORY JARVELA

             Plaintiff,                          Civil Action No. 19-12157

v.

                                        HON. MARK A. GOLDSMITH

WASHTENAW COUNTY, et al.

             Defendants.

_____/

**OPINION & ORDER**
**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT RICHARD HOUK'S MOTION FOR SUMMARY JUDGMENT (Dkt. 81); (2) GRANTING DEFENDANT WASHTENAW COUNTY'S MOTION FOR SUMMARY JUDGMENT (Dkt. 81); (3) GRANTING DEFENDANT ANDREW HAYES'S MOTION FOR SUMMARY JUDGMENT (Dkt. 78); (4) GRANTING DEFENDANTS ROBERT TREVINO AND VILLAGE OF CLINTON'S MOTION FOR SUMMARY JUDGMENT (Dkt. 76); (5) GRANTING PLAINTIFF CORY JARVELA'S MOTION TO STRIKE EXPERT AND EXPERT REPORT (Dkt. 74); AND (6) GRANTING IN PART AND DENYING IN PART HOUK AND WASHTENAW'S MOTION TO EXCLUDE EXPERT TESTIMONY (Dkt. 80)**

This case concerns an encounter between Plaintiff Cory Jarvela and several police officers, including Defendants Robert Trevino of the Village of Clinton Police Department, Richard Houk of the Washtenaw County Sheriff's Department, and Andrew Hayes of the Michigan State Police.[1] Jarvela operated his vehicle while intoxicated one night and crashed his car into a tree while attempting to evade Trevino's pursuit. After he fled on foot, he was pursued by Houk, Trevino, and Argo, a canine under Houk's control. When Argo located Jarvela, the dog and Jarvela fought, leading to a forceful arrest. Jarvela sued Houk and Trevino for excessive force, Hayes for failure

---

[1] Two of Hayes's colleagues, Daniel Clise and Jefferey Schmerheim, were present during part of the encounter; claims against them were dismissed without prejudice by stipulation (Dkt. 68).

to intervene, Houk for malicious prosecution under state and federal law, and the Village of Clinton and Washtenaw County for customs and practices allegedly causing the officers to violate Jarvela's rights.

The Defendants all filed motions for summary judgment. Summary judgment is denied as to the excessive force claim against Houk. The balance of Houk's summary judgment and each of the other Defendants' motions for summary are granted. Additionally, Jarvela filed a motion to strike Houk and Washtenaw's expert and expert report, which is granted. Finally, Houk and Washtenaw filed a motion to exclude Jarvela's expert testimony, which is granted in part and denied in part.

## I.  BACKGROUND

The facts leading up to the encounter between Jarvela and the officers are relatively uncontested. On August 19, 2017, Jarvela consumed an estimated four to six Bacardis-and-Coke at his home. Jarvela Dep. at 15–16 (Dkt. 81-2). Jarvela then drove from his home to a Shell gas station to buy cigarettes. Id. at 16. A gas station employee called Trevino's cell phone to report that a "drunk guy" had just left the gas station and was driving a black Chevrolet Silverado. Trevino Dep. at 40–41 (Dkt. 81-3).

### A.  Trevino's pursuit of Jarvela

Trevino saw Jarvela cross his path within seconds of putting his phone down and began to follow him. Trevino observed Jarvela drift to the center of the road and increase his speed in a 25-mile-per-hour-zone. Id. at 42–43. When the road crossed into Washtenaw County and the speed limit increased to 55 miles per hour, Jarvela "increased his speed dramatically well over the 55-zone." Id. at 44.

At some point during this pursuit, after observing a traffic violation, Trevino turned on his lights.  Id. at 43–44.  Trevino then radioed his dispatch to describe the pursuit and to advise Washtenaw County of the pursuit, because he had crossed into their jurisdiction.  Id. at 45.  Four to five minutes into the pursuit, Jarvela crashed his truck into a tree.  Id. at 46.  Trevino saw Jarvela exit the truck and flee through what Trevino described as "thick brush."  Id. at 48.  Trevino checked the vehicle for passengers and clues as to why Jarvela might have fled.  Id. at 50–54.  He then took a moment to compose himself and assess the situation.  Id.  at 54.

### B.  The search for Jarvela

Trevino did not pursue immediately.  Id.  According to Trevino, Houk was the next officer to arrive on the scene, approximately 11–13 minutes after Trevino had stopped.  Id.  at 55–56.  Trevino brought Houk up to speed.  Id. at 57.  Houk was a canine handler and brought his dog, Argo, out of Argo's space in Houk's vehicle.  Houk was equipped with a body-worn camera, which recorded a 14 minute, 26 second video, beginning shortly after Houk's arrival and concluding after Jarvela's arrest.  Houk Video (Dkt. 81-7).[2]

Houk retrieved Argo from the patrol vehicle and placed a harness on him with "SHERIFF" emblazoned in neon yellow, as well as a 15-foot lead.  Houk Video at 00:38–00:56; Houk Dep. at 47 (Dkt. 100-6).  Houk choked up on the lead so that Argo was only between 5–10 feet away during the track.  Houk Dep. at 50–51.

Houk and Argo began the track to locate Jarvela with Trevino trailing behind to provide cover.  Houk Dep. at 55–56.  Using the German command "Suchen" or "Such" Houk commanded

---

[2] Citations to the video reference the approximate minute and second of the video.

Argo to search.[3]  Argo proceeded to search around the area, which included mowed lawn and what Houk described as waist-high weeds.  See Houk Video at 3:00–6:00; Houk Dep. at 58.

In the meantime, after he fled his car, Jarvela laid down in the weeds.  Jarvela Dep. at 27. He admitted that he was trying to evade the police when he went into the weeds.  Id.  He said that he passed out.  Id.  For reasons he could not remember, he took off the white t-shirt and white shoes he had been wearing.  Id. at 28.

Argo, Houk, and Trevino located the shoes and shirt before they located Jarvela.  At 5:57 in the video, a white t-shirt matching the description of what Jarvela had been wearing that night appears visible on the camera.  Houk clicked his radio and said what sounds like "we've got his shoes and his shirt back here, so he's trying to [inaudible] his clothes."  Id. at 6:00.

### C.  The encounter between Jarvela, Argo, Houk, and Trevino

The encounter between Jarvela and the officers begins at approximately 6:10 in the video, when Jarvela first appears on the screen.  The parties dispute what happened next.

#### 1.  Jarvela's testimony

According to Jarvela, he came to when Argo bit his arm and a flashlight was shone in Jarvela's face.  Jarvela Dep. at 30.  He said he was on his back with a dog biting his right bicep and heard a "bunch of yelling and demands" for him to get on his stomach.  Id. at 30–31.  He gave the following testimony regarding what happened after hearing the command for him to get on his stomach:

> I was ordered to get on my stomach, to stop resisting.  I was laying on my back. Argo was on my right bicep.  So, I'm either going to take this 90-pound dog and throw him over the top of my body to get on my stomach, or I'm going to roll over to the easiest path, which would've been for me to roll over to my right, where I'm

---

[3] "Suchen" is a "track command" that means "seek" or "find."  Houk Dep. at 128.  At various points during the video, it is unclear whether Houk is saying "suchen" or "such," but they appear to be synonymous.

still fighting a 90-pound dog on my arm and trying to get his mouth out of my bicep. So, I rolled over on top of Argo, to try to get his arm off—try to get his mouth off of my arm.

Id. at 32.

He said he tried to take his left hand across his body to grab the dog by the snout and pull the dog off his arm.  Id. at 33. He said he flipped over to the right, which meant that he rolled on top of Argo's head, while Argo's mouth was still biting down on Jarvela's right arm.  Id. at 34–35.  At that point, when he was on his stomach (and on top of part of Argo's body), he was struck by Houk on the back of the head multiple times and told to get on his back.  Id.  at 36.  "So," Jarvela said, "I rolled back over onto my back, where I was struck by a taser, then rolled back over and was struck by another taser."  Id.

Jarvela further testified that he was dragged "out of the weeds by Argo and Deputy Houk" and put on his stomach. Id. at 41.  Michigan state troopers, who Jarvela believed arrived sometime during the commotion with Argo, handcuffed him.  Id. at 41–42.  Jarvela was then transported to Herrick Hospital, and then to the University of Michigan Hospital, for medical treatment. Id. at 42.

### 2.  Trevino and Houk's testimony

The officers remembered the encounter differently, with a particular point of dispute being whether Argo or Jarvela attacked the other first.  Upon seeing Jarvela and being caught by surprise, Houk "gave the tracking command again."  Houk Dep. at 130.  On the video, right after Jarvela appears on screen, Houk can indeed be heard yelling "Suchen."  Houk Video at 6:11.  He then gave Argo the "apprehension command," which is the word "packen."  Houk Dep. at 131.[4]

---

[4] There is some uncertainty about what word Houk actually used.  On the video, the word clearly sound like "packen," a commonly used dog command for bite.  In Houk's statement of material facts, his counsel states that Houk used the word "packen," defined there to mean "grip and hold."  Houk Statement of Material Facts ¶ 10 (Dkt. 81).  However, at his deposition, Houk answered

Houk testified that when he first saw Jarvela, he did not tell Jarvela to stay down or show his hands. Id. at 62. The reason was that "upon contact [Jarvela] attacked the dog." Id. He said that the first time he saw Jarvela, Jarvela was "sitting up and aggressing the dog." Id. Houk said that when Jarvela sat up, Argo was not yet gripping him. Id. at 63. Houk testified that he did not pull back on the lead, because Jarvela was attacking the dog. Id. at 64. When asked, Houk stated that he did not know whether he gave the "packen" command before or after Jarvela made contact with Argo's head. Id. at 69.

Trevino likewise testified that Jarvela partially sat up and made contact with Argo before Argo bit him. Trevino Dep. at 67. When asked if Jarvela punched Argo with a closed fist or used the palm of his hand to push Argo away, Trevino described the contact as "kind of more of an open hand like punch slash open hand like he kind of had it open and then kind of pushed it away, but it was at the dog's face." Id. at 68.

### 3. The video

The video is inconclusive as to whether Argo or Jarvela attacked the other first, but Jarvela does appear to sit up from his back. See Houk video at 6:10–6:20. The audio is fairly clear. Houk yells the following words during this encounter: "Suchen, Packen, Packen, Packen, Packen, Packen, attaboy, get that guy, hold 'em, hold 'em, hold 'em." Houk Video at 6:10–6:24. After

---

affirmatively when asked if the word he used was "kampfen," and if that word meant "fight or apprehend." Houk Dep. at 131. At another moment of the deposition, Houk did not say what German word he used, but said that the command meant to bite or apprehend. Id. at 60–62. He admitted that there was no meaningful difference between "bite" and "apprehend," because Argo was trained to apprehend suspects by biting and gripping them with his teeth. Because the word in the recording clearly appears to be "packen," and because no party appears to dispute that the word "packen" was used, the Court proceeds on the assumption that "packen" was the command used and that it was meant to tell Argo to bite and thereby apprehend Jarvela.

the fourth "Packen" in this sequence another voice, presumably Trevino's, can be heard saying, "get down." <u>Id.</u> at 6:17.

At around 6:24, Argo appears to have something of the upper hand, and Jarvela can be seen on his back. From his back, Jarvela rolls onto his right shoulder, so that he is facing Argo and is between Argo and Houk. Around this time, for the first time, Houk addresses Jarvela, yelling, "Get on your stomach right now. Get down on the ground right now. On your stomach now." <u>Id.</u> at 6:25–6:29. By no later than the third of these commands, Jarvela is more or less in compliance, but with one hitch: Argo is between his stomach and the ground.

Houk returns to speaking to Argo, saying "atta boy, hold 'em." <u>Id.</u> at 6:30. Immediately after Houk says, "hold 'em," Trevino says "let go," presumably addressing Jarvela. <u>Id.</u> at 6:31. At least one red dot appears on Jarvela's bare back at that moment, seemingly indicating Jarvela's first deployment or aiming of his taser. <u>Id.</u> at 6:30. Houk says, "atta boy, hold 'em," again, while Trevino says, "get on the ground." <u>Id.</u> at 6:34. It is difficult to make out the exact sequence of events, but Houk and Trevino each seem to repeat their respective comments. <u>Id.</u> at 6:35–6:36. Beginning around 6:37, Houk strikes Jarvela approximately seven times while yelling "let go of the fucking dog now. Let go of the fucking dog." <u>Id.</u> at 6:37.

While Houk is striking Jarvela, Trevino can be heard stating "watch out," after which he deploys his taser. At 6:43, probes from the taser appear connected to Jarvela's back and the taser crackles with activity, while Jarvela seems to be moving onto his back. Jarvela is no longer on top of Argo, and his left hand is raised or off to the side in a manner that might indicate surrender (it certainly is not around Argo's neck), and his right hand and Argo are outside the view of the camera. <u>Id.</u> at 6:45. At 6:45, Trevino steps on Jarvela's stomach, and he then proceeds to deploy his taser against Jarvela. <u>Id.</u> at 6:46-6:50. Meanwhile, Houk continues to command and praise

Argo: "Packen.  Hold 'em. Atta, boy, hold that guy.  Hold that guy.  Hold that guy.  Atta dog. Good dog.  Hold that guy," after Houk's strikes and Trevino's intervention at least partially separated Argo and Jarvela, such that Jarvela is no longer on top of Argo, and his left hand is not engaged with Argo.  Id. at 6:45–6:53.

Trevino yells, "get on the ground let go," while Houk yells for Jarvela to get on his stomach. Id. at 6:50–6:55.  Jarvela complies.  Id.  Houk then continues to tell Argo, "attaboy, hold on, hold on.  Hold on, atta boy, atta boy," while two officers, Trevino and state trooper Hayes, place handcuffs on Jarvela.  Id. at 6:56–7:07.[5]  Houk then leads Argo away from Jarvela, praises him, and tells him to "platz" (sit).  Id. at 7:04–8:00.  When Jarvela tells Argo he wants to check him out, Argo lunges in Jarvela's direction, although it is unclear whether Argo makes contact with Jarvela.  Id. at 8:04.[6]

After this incident, Argo and Houk walk away from Jarvela.

---

[5] It is unclear when the state troopers entered the scene.  From watching the video, Jarvela deduced that they had arrived by the time he was being tasered, because the video shows two laser beams being pointed at him, which led him to conclude that more than two officers were present.  Jarvela Dep. at 40.  However, Jarvela testified that he was unaware of how many officers were present while Argo was biting him.  Id.  As he explained, "I was being mauled by a dog, being beat in the back of the head and tasered, so I wasn't paying—I wasn't counting officers while all of that was going down."  Id.

[6] Jarvela claims that at this point, Argo nipped him on the side, though that nip did not draw blood or require stiches.  Jarvela Dep. at 77.  At Jarvela's criminal trial, Houk testified that Argo "broke the down," but that he did not lose control of Argo.  Houk Trial Testimony at 70 (Dkt. 100-5).  The Court takes "broke the down" to mean that Argo deviated from the platz/sit position without being given a release command or any other command.  Houk claims that the "video refutes Plaintiff's claim that Argo nipped him in the side" at that point, Houk MSJ at 16 (Dkt. 81), but the video is inconclusive on that issue.

### D.  Jarvela's criminal cases

Jarvela was charged with four counts in Lenawee County.  He pled guilty to Count III, Police Officer–Assaulting/Resisting/Obstructing, and Count IV, Operating–Impaired, on September 27, 2017.  See Presentence Report at PageID.2100 (Dkt. 81-33).  Pursuant to a plea agreement, Count I, Police Officer–Fleeing–Third Degree–Vehicle Code, and Count II, Operating While Intoxicated, were dismissed.  Id.  The report includes Trevino's description of the offense, which includes the following paragraph:

> Argo, the dog, arrived and located the defendant in the bushes. The defendant began to swing and punch at Argo. Argo grabbed the defendant by the bicep. The defendant started to choke Argo and the deputy delivered strikes to the defendant. The defendant continued to choke Argo. The deputy attempted to taser the defendant without good success. Three state troopers arrived and assisted in gaining control of the defendant.

Presentence Report at PageID.2100–2101.

Jarvela admitted to the factual accuracy of the presentence report.  See Sentencing Tr. at 4 (Dkt. 81-34).  Jarvela was sentenced to five years of probation, 200 hours of community services, as well as costs and fees.  Id. at 9.

In Washtenaw County, Jarvela was charged and acquitted of two counts of Police Officer–Assaulting/Resisting/Obstructing and one count of injuring or harassing a police animal while committing a crime.  See Order of Acquittal (Dkt. 104-8).

## II.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247–248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

"When videotape footage exists, the reviewing court need not credit the version of a party who asserts facts 'blatantly contradicted' by the videotape; rather it should view the facts in the light depicted by the videotape." Cunningham v. Shelby Cnty., Tennessee, 994 F.3d 761, 763 (6th Cir. 2021) (quoting Scott, 550 U.S. at 380–381).

Standards for reviewing the motions concerning expert testimony are discussed below.

### III.    ANALYSIS

Several Defendants have moved for summary judgment on the claims against them. Each claim is addressed in turn. The excessive force claim against Houk survives summary judgment because the evidence, viewed in the light most favorable to Jarvela, supports a claim that Houk

violated Jarvela's clearly established right to be given an opportunity to surrender without being attacked by a dog.  The other claims do not survive summary judgment.  Finally, the Court turns to motions to strike experts, one by Jarvela and one by Houk and Washtenaw County.  The former is granted, and the latter is granted in part and denied in part.

### A.  Excessive force (Houk)

Jarvela asserts that Houk used excessive force when arresting him.  Claims involving excessive force are analyzed under the following standard:

> Claims that police officers used excessive force in the course of an arrest are analyzed under the Fourth Amendment and the "objective reasonableness" standard.  In applying the objective reasonableness test, the court is required to pay careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Campbell v. City of Springboro, Ohio, 700 F.3d 779, 786–787 (6th Cir. 2012) (punctuation modified, citations omitted).

Houk has moved for summary judgment, arguing both that he did not violate Jarvela's rights and that he is entitled to qualified immunity, an overview of which follows:

> Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  In order to determine whether or not qualified immunity applies in an excessive force claim, the Court must engage in a two-step inquiry, addressing the following questions: (1) whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated, and if so, (2) whether that right was clearly established.  When evaluating the defense of qualified immunity on a motion for summary judgment, the court must adopt the plaintiff's version of the facts.

Id. at 786.

The questions may be addressed in either order, although the Supreme Court has stated that is "often beneficial" to address the question of whether a violation occurred first.  See Pearson v.

Callahan, 555 U.S. 223, 236 (2009).  However, in this case, in which Jarvela prevails on both qualified immunity questions, it makes sense to address the questions in the opposite order.  The analysis undertaken to define the right at issue and determine that it was clearly established also provides the standard of conduct against which Houk's conduct is measured, so that analysis is taken up first.  However, before reaching either question, it is worth presenting a summary of the Sixth Circuit's long history of cases involving the appropriate use of a police dog, which is relevant to both questions.

Campbell, cited by both parties, cites three crucial cases that define the ends of a "spectrum" on which canine cases may fall.  700 F.3d at 788–789.  The first of these two cases involved permissible uses of a police canine, while the third involved an impermissible use.  Each case is discussed in turn.

In Robinette v. Barnes, 854 F.2d 909 (6th Cir. 1988), the court affirmed the grant of summary judgment in favor of defendant police officers whose dog killed a burglary suspect.  Crucial in the court's reasoning was the fact that the officer was forced to explore an enclosed unfamiliar area where the burglary suspect was hiding, and the officer "was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect."  Id. at 913–914 (quoting the district court).

In Matthews v. Jones, 35 F.3d 1046, 1051 (6th Cir. 1994), the court found that a police dog was used in an appropriate manner to apprehend a man who had fled on foot from pursuing officers after being pulled over for speeding and reckless driving.  The defendant officer first warned the suspect several times before releasing his dog to apprehend him.  Then, the officer found the suspect lying in the weeds.  Id.  The officer warned the suspect that if he remained still, the dog would be recalled; when the man moved, the dog "enforced the order."  Id.

12

<u>Campbell</u> summarized the lessons learned from these two cases:

> In both <u>Robinette</u> and <u>Matthews</u>, the court determined that the suspects were potentially dangerous based upon the crimes they committed and their irrational behavior. Further, the spaces in which the suspects were located—an unlit building and a dark heavily wooded area—made police vulnerable to ambush. The court also found that the police dogs in these cases were properly trained and that the officers gave the suspects several warnings prior to allowing the dogs to engage the suspect.

<u>Campbell</u>, 700 F.3d 779.

<u>Campbell</u> then contrasted these two cases with a third, which it described as being "on the opposite end of the spectrum." <u>Id.</u> at 789. In the third case, <u>White v. Harmon</u>, the court denied summary judgment to an officer who allowed a little-trained canine, who had previously bitten someone, to bite a handcuffed suspect. 65 F.3d 169, 1995 WL 51886, at *3 (6th Cir.1995).

<u>Campbell</u> itself involved two incidents related by the fact that the same dog (Spike) and handler (Nick Clark) were involved in both incidents. One plaintiff, Samuel Campbell, was pursued when after a night of drinking, he pounded so loudly on his friend's front door in an effort to return his friend's keys that a neighbor, fearful Campbell was a burglar or worse, called the police. 700 F.3d at 784. Campbell laid down on the ground near an outbuilding in an attempt to avoid a confrontation with the police. <u>Id.</u> The officers interpreted his avoidance of them as flight and concluded that they were dealing with an attempted burglary. <u>Id.</u> at 785.

Clark deployed Spike near the side of the house. <u>Id.</u> Spike led Clark and his fellow officer to a fence in an adjoining yard that led to the outbuilding near where Campbell had laid down on the ground. <u>Id.</u> Spike bit Campbell on the left leg and continued to bite Campbell at different places on his leg for some period of time, possibly 30 to 45 seconds. Clark had not issued Campbell any warning and claimed he was looking at a fellow human officer discussing a way to get over or around the fence when Spike engaged Campbell. <u>Id.</u>

13

The second incident involved Chelsie Gemperline, who was arrested at a loud party for suspected underage drinking.  Id.  She somehow escaped her handcuffs at the patrol car where the officers left her.  After Clark was notified that Gemperline had escaped, he was heard saying, "Jeez Louise . . . [unintelligible] this bitch, . . .  I've had it," and "[s]he's gonna get a nice rude awakening here in one second or two, . . . it's not gonna feel very good."  Id.

Clark then deployed Spike on a "tactical fugitive track."  Id. at 786.  Spike led Clark into a fenced-in backyard on the opposite side of the street.  Id.  As they entered the backyard, Clark interpreted Spike's air-scenting behavior as indicating that Spike smelled something on the deck of the house.  Id.  Spike then darted toward a child's playhouse that was located near the gate to the backyard.  Id.  Spike was able to reach his head far enough through the window of the playhouse to nip Gemperline's chin and bite her right upper thigh.  Id.  Gemperline grabbed Spike's jaws and tried to pry him off her leg.  Id.  Spike briefly let go of her leg, but then he clamped down again.  Gemperline continued to struggle with Spike until she either passed out or went into shock.  Id.  Clark testified that as soon as he heard Gemperline scream he reached into the playhouse, grabbed Spike by his collar, and lifted straight up to cut off Spike's airway, a maneuver called a "choke off."  Id.  Clark did not warn Gemperline before Spike attacked her.  Id.

The Campbell court compared the facts of the cases before it in the context of the three cases it discussed.  Compared to the facts in Robinette and Matthews, the searches for Gemperline and Campbell "occurred in areas unlikely to expose police to ambush and the suspects were not believed to be a threat to anyone at the time the canine unit was called in."  Id. at 789.  Clark also failed to give warnings to either of the suspects prior to deploying Spike.  Id.  Importantly to the Campbell court, Spike's training was "questionable."  Id.

14

Campbell was followed by Rainey v. Patton, 534 F. App'x 391, 397 (6th Cir. 2013), which assessed the Sixth Circuit precedent to that point.  It stated that the "cases granting qualified immunity to the officer highlight the importance of facts establishing that a suspect has failed to surrender or has yet to be apprehended and has been given the opportunity to avoid an encounter with a dog before its employment."  Id.  In the absence of such facts, use of a canine would be unreasonable.  The case further stated it "it would be clear to a reasonable officer that employing a police dog against an unarmed suspect detained on the basis of a traffic offense, who was on the ground and not attempting to flee, would constitute excessive force."  Id. at 397.

> **1. Jarvela had a clearly established rights to be detained without excessive force, which included being provided an opportunity to avoid an encounter with a dog before the dog was deployed.**

No later than Graham v. Connor, 490 U.S. 386, 397 (1989), individuals have had a clearly established right to be arrested with no more force than is objectively reasonable in light of the facts and circumstances confronting the officers.  That right has been refined over time, but it still provides the backdrop to this case.

No later than Rainey, issued in 2013, a suspect's right to be given the opportunity to avoid an encounter with a dog before its deployment was clearly established.  By contrast, Houk cites Miller v. Ribicki, 259 F. Supp. 3d 688, 699 (E.D. Mich. 2017), for its conclusion that no Supreme Court or Sixth Circuit cases have adopted a bright-line rule that an officer must warn a suspect before allowing a dog to bite.  This is a fair reading of Miller, with which this Court has no quibble.  But Jarvela does not need such a bright line rule to succeed.  Rainey acknowledges a baseline rule that the use of a canine is unreasonable when the suspect has not been afforded an opportunity to avoid the encounter.  Miller recognizes commonsense deviations from that norm.  The officer in Miller "reasonably believed that he was tracking a suspect who had threatened to kill other

individuals and who could be armed with a deadly weapon. . . . And the track was occurring in a dark and heavily wooded area." Miller, 259 F. Supp. 3d at 698. The defendant officers handling the dog, Zando, conducted the track accordingly:

> During the track, Jacobson had Zando on a "30 foot" lead (i.e., a 30-foot leash), and they proceeded in what Jacobson called "stealth" mode—meaning that they did not announce their presence or give any advance warning or notice to Miller that they were approaching. Jacobson explained that he operated in stealth mode because he was concerned that he would be vulnerable to ambush in the dark woods if he revealed his presence and location.

Id. at 693 (punctuation modified, citations omitted). Jacobson also had information from a fellow officer that the plaintiff may have been armed and dangerous that Jacobson permissibly relied upon. Id. at 693.

The circumstances of Miller demonstrate the wisdom of avoiding bright line rules such as a per se duty to warn. As Miller stated, "there is a reasonable argument" that such a rule "could create real danger for officers in circumstances like those confronted by Jacobson." Id. at 695 n.5. But this does not mean that officers are free, in all circumstances, to track suspects with dogs in such a way that is intended to, or will likely, result in the dog detaining the suspect with the dog's teeth before the suspect is provided an opportunity to avoid contact with the dog.

Miller ultimately stands for the proposition that in some cases, it is unreasonable to require officers to announce their presence before deploying a canine, and that in those cases, a suspect's right to receive such a warning is qualified or lost entirely. However, this is a fact-bound question. As shown below, the facts, viewed in the light most favorable to Jarvela, do not show the kind of exceptional circumstances present in Miller were similarly present in Houk's pursuit of Jarvela.

**2. Jarvela has raised a genuine fact question as to whether Houk violated his right to be detained without excessive force, including his right to be provided an opportunity to avoid an encounter with Argo.**

When the facts are viewed in the light most favorable to Jarvela, Houk acted unreasonably in using Argo to track and detain Jarvela. That analysis proceeds in two parts. First, the facts do not show the kind of exceptional circumstances illustrated by <u>Miller</u> that would allow an officer to deploy a dog without warning. Second, Houk's use of force was not, as a matter of law, objectively reasonable under the circumstances.

**a. A fact questions exists as to whether Houk was justified in failing to provide Jarvela an opportunity to avoid an encounter with Argo.**

The facts of this case distinguish <u>Miller</u>. Houk gives two explanations for not issuing a warning during his track: first, that while using Argo to track Jarvela, he had no intent to use Argo to apprehend Jarvela; and second, that giving a warning would have implicated serious safety concerns. <u>See</u> Houk Statement of Facts ¶ 7 (Dkt. 81); Houk Dep. at 148–150.

The first explanation is unavailing. Subjective intent is irrelevant in excessive force cases. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." <u>Graham</u> 490 U.S. at 397. What matters are the "facts and circumstances" confronting the officers. <u>Id.</u> Among the facts known to Houk was how Argo was trained. Houk testified that Argo was trained to bite and fight—not search and bark—and that unless Argo was separated from the suspect by a physical barrier, he was trained to find and bite a suspect he was commanded to track. Houk Dep. at 33–34. So whatever Houk may have wanted or intended, his dog behaved as Houk knew or should have known he would behave if he came across Jarvela. Houk's subjective intent that Argo do something other than what he was trained to do does not justify Houk's actions.

17

The second explanation, concerning officer safety, is not much more persuasive. As discussed below in the context of the <u>Graham</u> factors, Jarvela did not present known risks that made him seem particularly dangerous. The circumstances were a far cry from <u>Miller</u>, which involved a suspect the officers had reason to believe had threatened to kill people and may have had a weapon. Furthermore, the officers' behavior, as captured in the video, contradicts the notion that the officers were engaged in anything like the "stealth mode" described in <u>Miller</u>. Houk communicated with Argo and Trevino throughout the track, and neither Houk nor Trevino seem to be whispering nor limiting their conversation to mission-critical exchanges. <u>See</u> Houk Video at 3:00–6:00. Houk conversed with Trevino, apparently answering questions about how Argo was tracking. Houk Video at 4:31. One of the officers can be heard on the recording saying he would be off for the next three days. <u>Id.</u> at 5:08–5:12. Houk ordered Argo to stop eating grass. <u>Id.</u> at 5:36. The officers' radios were on throughout the track and can be heard in the video. Furthermore, when Houk was asked why he did not issue a command to Jarvela once he saw his shirt and shoes, he did not say anything about needing to maintain stealth. Houk Dep. at 58. Instead, he said that the presence of clothing did not necessarily indicate the proximity of the suspect. <u>Id.</u>

A jury could reasonably conclude that the officers were not going to significant lengths to conceal their presence, belying a claim that they failed to provide Jarvela an opportunity to avoid the encounter with Argo, which the Constitution requires in most cases.

In sum, a genuine dispute of material facts precludes summary judgment on the question of whether Houk violated Jarvela's right to be given an opportunity to surrender without being attacked by a dog.

**b.  A fact questions exists as to whether Houk's use of force was reasonable under the circumstances.**

While a jury could find that a constitutional violation was complete by the time the encounter between Argo and Jarvela began, it is also worth considering the reasonableness of Houk's use of force once he came across Jarvela.  Houk's behavior—particularly, issuing the pachen command numerous times and striking Jarvela—is measured against the <u>Graham</u> factors: (i) the severity of the crimes at issue, (ii) the immediate threat Jarvela posed to the safety of officers or others, and (iii) whether Jarvela was actively resisting.  <u>See</u> <u>Campbell</u>, 700 F.3d at 787.

### i.    The severity of the crime at issue

In general, the more severe the crime, the more force is justified.  <u>See</u> <u>Graham</u>, 490 U.S. at 396.  Houk cites <u>Gaddis ex rel. Gaddis v. Redford Twp.</u>, 364 F.3d 763, 774 (6th Cir. 2004), for the proposition that driving while intoxicated and fleeing an officer—two crimes Jarvela was reasonably suspected of having committed—were "moderate" in severity.  Houk MSJ at 12. However, as that case demonstrates, "moderate" is not "severe," and it only justified a moderate use of force (application of pepper spray) in a case where the other <u>Graham</u> factors weighed more heavily in the officers' favor.  <u>See</u> <u>id.</u> (noting that the suspect brandished a knife at the officers, had announced an intention to flee, and would have posed a danger to others if allowed to leave). A jury could reasonably conclude that the crimes of which Jarvela was suspected (and later convicted) did not, on their own, justify Houk's use of force.

### ii.    Whether the suspect poses an immediate threat to the safety of the officers or others

On the second <u>Graham</u> factor, Houk argues that Jarvela "exposed officers to potential ambush and posed an unknown safety risk to officers and others."  Mot. at 12.  The key phrase here is "unknown safety risk."  Campbell's case is the most direct analog.  He, too, fled police at

19

night.  And while the environment in which he hid himself might not have left officers feeling particularly susceptible to ambush, one of the crimes of which he was suspected—burglary—was more probative of a risk to officers than Jarvela's crimes were.  Cf. Robinette, 854 F.2d at 913–914 (finding that a burglary suspect's flight justified deadly force under the circumstances).  And in Campbell's case, as discussed in both Campbell and Rainey, the officer was not permitted to deploy a dog without giving the suspect an opportunity to avoid the encounter.[7]

Houk cites Matthews, 35 F.3d at 1051 for the proposition that a drunk driving suspect who flees into the woods poses a threat to the officers' safety as well as the safety of others.  But Matthews is unhelpful to Houk, given the particular nature of Houk's alleged wrongdoing—failing to provide Jarvela an opportunity to avoid the encounter with the dog initially, and then continuing to command Argo to bite Jarvela before telling Jarvela what he needed to do to end the encounter. The defendant officer in Matthews repeatedly ordered the suspect to surrender and warned that the dog would be released if he did not.  Id. at 1048.  Houk did not issue such an order.  Therefore, a jury could reasonably conclude that Houk behaved unreasonably in pursing Jarvela with Argo and then ordering Argo to bite Jarvela without providing Jarvela an opportunity to avoid a confrontation with the dog or an opportunity to end the encounter.

### iii.  Whether the suspect is actively resisting arrest or attempting to evade arrest by flight

The third factor must be weighed in two contexts: before the first encounter between Argo and once the confrontation began.  Prior to the engagement with Argo, there is no evidence that

---

[7] Campbell differs somewhat in its emphasis on the fact that Spike may not have been properly trained.  700 F.3d at 789.  Argo, by all accounts, acted consistently with his training and Houk's commands, with the exception of his behavior at the end of the encounter, when he disobeyed a "platz" command and lunged at Jarvela.  However, the fact that Argo was trained (and, once the encounter began, commanded to bite Jarvela) does not make his deployment any more reasonable than Clark's deployment of Spike.

Jarvela actively resisted arrest.  Undoubtedly, he had been fleeing from Trevino in his car and on foot.  However, nearly every dog-involved case discussed to this point involves similar initial flights, and the rule in those case is that such flights do not, on their own, warrant deployment of a dog without an opportunity to surrender prior to encountering the dog.  Furthermore, the officers had no reason to believe that Jarvela was armed or had threatened to hurt the officers or anyone else.

Once the encounter began, Jarvela engaged in some resistance against Argo.  The degree of the resistance is impossible to establish from the video alone, requiring a jury to weigh the parties' and witnesses' testimony in light of the video and other evidence available.  For five reasons stated below, the documented resistance cannot support summary judgment.  Additionally, Houk argues that Jarvela is judicially estopped from arguing that he did not resist Argo.  But that argument is also rejected, as discussed below.

First, although Jarvela admitted to struggling with Argo, see Jarvela Dep. at 33–36, this does not mean Houk was justified in his use of force.  Gemperline's acts of struggling with Spike in the second Campbell case did not exonerate the officer who unnecessarily created the risk of a violent encounter.

Second, the most troubling moment captured on camera, as far as the risk to Argo goes, was when Jarvela rolled on top of Argo.  A jury could reasonably find that that was the result of the issuance of a poorly timed command for Jarvela to get on his stomach.  Houk, in fact, admitted under oath that by commanding Jarvela to get on his stomach, he was "asking him to lay down on top of the dog."  See Houk Trial Testimony at PageID.2913 (Dkt. 104-5).

Third, in reviewing the video, it is unclear what, if any, commands Jarvela failed to heed to the best of his ability.  He repeatedly makes movements onto his stomach or back that appear to

21

comply with the orders being given to him.  And he did so under substantial duress, as he was being subdued or attacked by Argo for much of the encounter.

Fourth, the instructions being given to him were difficult to understand, much less comply with.  Houk was yelling, largely in dog-command German, for Argo to bite and hold Houk, while Houk and Trevino occasionally issued a command to Jarvela.  At times, logically opposite commands of "hold 'em" (directed at Argo) and "let go" (directed at Jarvela) were being issued simultaneously.

Fifth, Argo, as a dog trained to detain humans with his teeth, was a terrifying antagonist, who Jarvela would understand was deaf to any acknowledgement of submission and surrender by Jarvela.  A jury could reasonably conclude that Jarvela was reacting defensively in the face of terrifying circumstances, not actively resisting.

Houk is certainly entitled to argue to a jury that Jarvela's resistance justified his actions. But in light of the facts stated above, a jury could reasonably find that the degree of force used was not commensurate with the amount of resistance.  Therefore, analysis of this <u>Graham</u> factor does not support summary judgment.

Before turning to the totality of the circumstances—a weighing of the three <u>Graham</u> factors—an additional argument on the third factor must be considered.  Houk argues that Jarvela is barred from arguing that he was not resisting Argo by judicial estoppel.  For the reasons that follow, this argument is rejected.

Judicial estoppel is an equitable doctrine that generally "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  <u>Pegram v. Hendrich</u>, 530 U.S. 211, 227 n.8 (2000).  Courts generally look to three factors to evaluate whether invocation of judicial estoppel is appropriate: (i) whether

a party's later position is clearly inconsistent with its earlier position; (ii) whether the party has succeeded in persuading a court to accept that party's earlier position, creating the impression that one court was misled; and (iii) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. New Hampshire v. Maine, 532 U.S. 742, 743 (2001).

This doctrine has been applied in cases to hold criminal defendants-turned-civil-plaintiffs from disputing facts to which they stipulated in their plea agreements.  See, e.g., Mirando v. U.S. Dep't of Treasury, 766 F.3d 540, 545–548.  Houk argues that Jarvela should be estopped from arguing that he did not punch and choke Argo, because he admitted before the Lenawee County sentencing court that the presentence report's recounting of the facts was accurate, and that report describes Jarvela as punching and choking Argo based on Trevino's description of the offense.

The first factor leans in Houk's favor.  The presentence report states that Jarvela "began to swing and punch at Argo," that he "started to choke Argo," and that he "continued to choke Argo" after Jarvela was struck by a deputy.  Presentence report at PageID.2100–2101.  This is plainly at odds with Jarvela's position that he "never tried to do anything to hurt Argo."   Jarvela Resp. to Houk MSJ at 13.

On the second factor, the sentencing court undoubtedly accepted the facts as presented in the presentence report.  See Sentencing Tr. at 8 ("They called out Argo the dog.  You tried to take him on, too.").  Whether Jarvela "succeeded in persuading a court to accept [his] earlier position," New Hampshire, 537 U.S. at 743, is a somewhat murkier question.  On the one hand, when asked point blank if the information contained in the presentence report was factually correct, Jarvela said yes.  Sentencing Tr. at 4.  On the other hand, a defendant acquiescing to the prosecution's presentation of the facts is not what comes to mind when one thinks of "persuading a court to

accept [a] position."  This awkwardness of applying judicial estoppel is to the instant case is best illustrated in discussing the third factor, to which the Court now turns its attention.

The third factor precludes application of judicial estoppel, because Houk has not established that the statements about Argo accrued to Jarvela's benefit.  Argo was only mentioned by the sentencing court once, as noted above, in discussing the extent of Jarvela's wrongdoing.  The court did not discuss any downward departure for acceptance of responsibility.  See generally Sentencing Tr.; see also Mirando, 766 F.3d at 548 (rejecting the argument that the plaintiff received an unfair advantage by accepting responsibility for his crime where no evidence was presented that the sentencing court granted credit for acceptance of responsibility).  Houk's only "proof" that Jarvela derived an unfair advantage from admitting that he punched, kicked, and choked Argo is that Jarvela admitted that the crimes to which he pleaded guilty could have carried a harsher sentence than what he received by pleading guilty.  See Jarvela Dep. at 59 (Dkt. 81-2).  But this neither establishes that Jarvela's acceptance of responsibility in general, nor his admission to the presentence report's factual accuracy in particular, prompted the court to issue a sentence below the statutory maximum.

Mirando, which involved a defendant who pled guilty to tax crimes as part of an apparent deal to spare his family from prosecution, provides some support for the position that where a defendant gains an advantage from accepting a plea agreement, the defendant-turned-plaintiff should be estopped from contesting any detail contained in the plea agreement.  766 F.3d at 548.  ("Forgoing prosecution of Mirando's family was not a benefit to the government, but in fact was a detriment.  Therefore, the provision must be a benefit to Mirando; otherwise, it would not have been included in the agreement and would not have been his admitted motivation for entering it.").  But such a broad reading of Mirando would be inappropriate here.  The information concerning

24

Jarvela's behavior toward Argo was only tangentially relevant to the Lenawee case as providing general context of what transpired the night of the encounter.  It was not an element of any offense with which Jarvela was charged in Lenawee County.  <u>See, e.g.</u>, <u>United States v. Hammon</u>, 277 F. App'x 560, 566 (6th Cir. 2008) (allowing a defendant-turned-plaintiff in tax-related cases to overcome a judicial estoppel argument when the exact dollar amount of taxes owed was not an element of the offense the individual was charge with and his plea agreement did not stipulate to an exact amount).  Certainly, it did not save Jarvela from being charged in Washtenaw County for assaulting or harassing Argo or resisting or obstructing Houk.  And apparently, it did not prevent him from being acquitted either.  Furthermore, the fact was contained in a sentencing report created by probation services, as opposed to a plea agreement, lessening the likelihood that it was a bargained for component of a comprehensive deal that benefited Jarvela.[8]

Jarvela's conduct across his two criminal cases and this civil case does not reek of the kind of "cynical gamesmanship" judicial estoppel is meant to prevent, <u>see, e.g.</u>, <u>Teledyne Indus., Inc. v. N.L.R.B.</u>, 911 F.2d 1214, 1218 (6th Cir. 1990), but rather reveals a generally consistent position. Jarvela believes (i) he was wrong for driving drunk and fleeing from the law and (ii) he was wronged when he was arrested by officers employing excessive force.  Houk has not shown that any benefit Jarvela received for pleading guilty is attributable to his acceptance of a narrative in which Jarvela was the aggressor against Argo.  Therefore, Jarvela did not derive a benefit from his

---

[8] Furthermore, it would create a dangerous precedent to extend <u>Mirando</u> to its furthest possible reach—an assumption that a criminal defendant who pleads guilty has benefitted from every incriminating fact included in the charging and sentencing documents.  Such criminal defendants would be caught in a difficult position.  It is hard to imagine prosecutors and judges taking well to defendants challenging every factual detail supporting their pleas and convictions—particularly those that are irrelevant to the crime being charged.  Criminal defendants would risk losing the benefits of a plea deal, and such seemingly petty challenges would undercut the credibility of defendants attempting to accept responsibility for their crimes.  On the other hand, if criminal defendants remained silent, they would risk forfeiting arguments in civil cases like this one.

failure to challenge the sentencing report, and he is not estopped from arguing that Argo attacked him and he only defended himself against Argo.

### iv.   Totality of the circumstances

A jury reasonably applying the <u>Graham</u> factors could find them to weigh against Houk.  He did not appear to give Jarvela an opportunity to avoid an encounter with Argo, and the calamity that ensued could reasonably be attributed to the chaos that Houk's choice created.  Furthermore, Houk's strikes of Jarvela, punctuated by commands to get off the dog, could well be interpreted as punishment for Jarvela hurting his dog.

Furthermore, during a moment captured on the video after the encounter, Houk made numerous statements that could be interpreted as more deeply concerned for Argo's wellbeing than Jarvela's.  For example, he said, "once I realized he was trying to choke the dog,  it was on. . . . Didn't want him hurting my fucking dog."  Houk Video at 10:38–10:45.  Later, when Houk was recounting the moment when he perceived Jarvela as punching the dog, he said, "now I'm not pulling him off."  <u>Id.</u>  at 12:27.  This could well be interpreted as reflecting a mindset that once Jarvela took actions toward Argo that Houk interpreted as an attack, Houk was going to allow and encourage Argo to seek retribution with his teeth, and add a few punches of his own.

The video shows that there is at least a question of fact as to whether such violence was necessary to effect the arrest and protect all involved.

### B.  Malicious prosecution (Houk)

Houk has moved for, and is entitled to, summary judgment on Jarvela's state and federal malicious prosecution claim.

Concerning the federal claim, a plaintiff must prove four elements: (i) a criminal prosecution was initiated against him, and that the defendants made, influenced, or participated in

the decision to prosecute; (ii) there was a lack of probable cause to support the prosecution; (iii) the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (iv) the legal proceeding was resolved in the plaintiff's favor. Sykes v. Anderson, 625 F.3d 294, 308–309 (6th Cir. 2010). Houk raises challenges on two elements: first, that there is no evidence that Houk made, influenced, or participated in the decision to prosecute; and second, that there was probable cause for the criminal charges. Jarvela has not established a fact question as to either element.

Houk has cited caselaw standing for the proposition that merely submitting a police report and testifying at trial, without something more, is not enough to satisfy this standard. Houk MSJ at 21 (citing Richards v. Cnty. of Washtenaw, 818 F. App'x 487, 493 (6th Cir. 2020)). Jarvela neither challenges this interpretation of law nor presents any evidence that Houk made, influenced, or participated in the decision to prosecute other than submitting his report. Furthermore, where video exists of the encounter, it seems extraordinarily unlikely that a prosecutor would rely solely on a police report that is easily shown to be false by the video. There is simply no reason to think the prosecutor did not exercise independent judgment, after reviewing the video, and decided to institute charges based on more than the allegedly false police report.

Furthermore, Jarvela offers no response to Houk's probable cause argument. Instead, he cites his exoneration as evidence that a civil jury could find that Houk deliberately submitted a false report with the intention of instituting prosecution and securing conviction with false testimony at trial. Jarvela Resp. to Houk MSJ at 27–28. But this argument is deeply flawed. The fact that criminal trials employ the exacting "beyond a reasonable doubt" standard makes findings of "not guilty" nearly useless as evidence of any positive fact as to which a plaintiff is attempting

to establish a fact dispute in a civil case.[9]  Furthermore, whether Houk submitted a false report was not a question before the jury.  The jury could have reached its decision to acquit Jarvela for any number of reasons.  And even if it generally did not find Houk credible, that does not mean it believed he intentionally misled prosecutors into bringing charges, or that charges were only brought as a result.

To establish a claim of malicious prosecution against a police officer under Michigan law, "the plaintiff must establish that (1) the officer knowingly and deliberately swore to false facts in a complaint, and (2) the officer's statements were material or necessary to the finding of probable cause."  Small v. Chirco, No. 311728, 2014 WL 129278, at *3 (Mich. Ct. App. Jan. 14, 2014).

Jarvela's claim fails on both grounds.  Concerning the first element, Jarvela focuses only on the alleged inaccuracy of Houk's testimony; he offers no evidence that Houk was not merely mistaken.  See United States v. Noel, 488 F. App'x 928, 932 (6th Cir. 2012) (noting that a mistaken observation is not knowingly false).  Furthermore, given the existence of the video, the testimony of the officers, and the charges brought and pled-to in Lenawee County, there is no genuine question of fact as to whether Houk's alleged misrepresentations were necessary for the prosecutor to find probable cause to commence criminal proceedings.[10]

Houk is entitled to summary judgment on both malicious prosecution claims.

---

[9] It is not completely useless, as Sykes's fourth factor requires that the criminal-defendant-turned-civil-plaintiff had a favorable outcome at the criminal proceeding.  However, the fact that this element is separate from the probable cause element shows that exoneration is not enough to establish a lack of probable cause.

[10] Although Small's language of "material or necessary" might be read to allow the satisfaction of the second element of the two-part test anytime the officers provided information material to the finding of probable cause, Small itself did not take this approach, and found that a plaintiff's claim failed on this element when the officer's testimony was not necessary.

### C.  **Monell** liability (Washtenaw County)

To establish Section 1983 liability against Washtenaw County, Jarvela must: (i) identify a county policy or custom; (ii) connect that policy or custom to the county; and (iii) show that his particular constitutional injury was caused by the execution of that policy or custom. Alkire v. Irving, 330 F.3d 802, 814–815 (6th Cir. 2003) (citing Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 614–615) (1978)).  Jarvela does not bother engaging with Washtenaw's policy, instead asserting that "Defendant Washtenaw County has failed entirely to instill in Defendant Houk any appreciation for allowing suspects to surrender before attacking them."  Jarvela Resp. to Houk MSJ at 35.

Washtenaw County has submitted its police canine policy, which includes the following statement:

> Deployment of the Dog: A canine handler may deploy a dog to assist in the apprehension and arrest of a suspect, consistent with the Sheriff's Office Use of Force policy, with the following restrictions:
>
> > a. The dog will not be deployed if it appears likely that an innocent person may be injured.
> >
> > b. The dog will not be deployed if the suspect can be apprehended safely without the use of the dog.
> >
> > c. The canine handler must reasonably believe that immediate apprehension and arrest of the suspect is necessary to ensure the safety of the public.
> >
> > d.  The canine handler must warn a fleeing suspect, when possible, of his/her intent to release the dog to pursue and provide the suspect the opportunity to stop and surrender.
> >
> > e. If the suspect visibly surrenders either before the dog begins to pursue or after the dog is in pursuit, it is the handler's responsibility to make every reasonable effort to ensure that the dog does not bite the suspect.
> >
> > f. Use of Force Reporting: Whenever a police canine is used as a means of control, a Use of Force report shall be completed prior to the completion of the canine handler's shift.

Washtenaw Cnty. Canine Policy at PageID.2039 (Dkt. 81-21).

Provisions "c," "d," and "e" are at least as protective of suspects' rights as the Sixth Circuit's precedents. An officer following this policy would not be liable for the wrongdoing of which Houk is accused. Jarvela offers no evidence that the county failed to train Houk in this policy. He offers no evidence that Washtenaw failed to instill this policy in its officers or Houk, other than the fact that Houk may have violated it. But if an officer's violation of a constitutional norm is conclusive evidence that the violation was foreseeable, and if foreseeability were enough to prove municipal or county liability, <u>Monell</u> would provide nearly no protection to counties or municipalities at all. Jarvela has not presented any evidence that Washtenaw has a policy or custom of failing to train officers to use dogs appropriately, nor that Houk's alleged misuse of Argo was the result of such a policy or custom, rather than a rogue decision or exercise of poor judgment. Washtenaw County is entitled to summary judgment.

### D.  Excessive force (Trevino)

Jarvela has identified three incidents of alleged excessive force: Trevino's first deployment of his taser, <u>see</u> Houk Video at 6:42, Trevino stepping on his stomach, <u>see</u> <u>id.</u> at 6:45, and Trevino's second deployment of his taser, <u>see</u> <u>id.</u> at 6:50.

Trevino has moved for summary judgment on the excessive force claim against him, arguing that qualified immunity shields him from liability. To overcome the qualified immunity defense, Jarvela argues that the Sixth Circuit has clearly established that police officers may not use gratuitous force upon an arrestee after the arrestee has surrendered or been subdued. Jarvela Resp. to Trevino MSJ at 21–22 (citing <u>Baker v. City of Hamilton</u>, 471 F.3d 601, 607–608) (6th Cir. 2006)).

In his briefing, Jarvela presents himself as completely passive and thus deserving of <u>Baker</u>'s protection:

Defendant Trevino claims that he thought Plaintiff was still some sort of threat at the time that he tased Plaintiff. However, the first time that he tased Plaintiff, he was merely kneeling on the ground being bitten and punched in the back of the head. The second time that Defendant Trevino tased Plaintiff, Plaintiff was merely lying unarmed and shirtless on the ground, with multiple officers immediately nearby a dog latched to his arm, and posed little to no threat to anyone.

. . .

The first time, Plaintiff was on his knees, and the second time Plaintiff was merely lying on his back. At no point did Plaintiff take any aggressive action, do anything to make Defendant officers think that he was armed or dangerous, and had attempted to comply with officers' orders. Clearly a jury could see Plaintiff being thrashing around on the ground with Argo latched to his arm and easily decide that there was simply no need to also tase him.

Resp. to Trevino MSJ at 18–19, 22.

Jarvela's statement in his brief is contradicted by the video and his own testimony. As Jarvela admitted, before Trevino deployed his taser, Jarvela had grabbed Argo by the snout and rolled on top of Argo. Jarvela Dep. at 33–36. When the taser deployment began, Jarvela and Argo were not yet separated, and Jarvela's left hand (the hand used to grab Argo's snout while Argo was biting the right arm) was not yet free of Argo. Houk Video at 6:42. When Trevino stepped on Jarvela's stomach, Jarvela immediately reached for Trevino's foot, and then reached across his body toward Argo, after which Trevino deployed his taser for the second time. Id. at 6:45–6:56. Furthermore, Jarvela stated that the second taser hit him in the lower back, Jarvela Dep. at 38, showing that he was not passively lying on his back as he claimed. Simply put, Jarvela was resisting Argo, at least to some degree, and was not subdued when Trevino tasered and stepped on him.

It may be possible to view the video and the broader evidence and come to the conclusion that the only reason Jarvela had not surrendered by the time Trevino reached him was the fact that he was being attacked, unnecessarily, by Argo and Houk, or that his resistance was a reasonable and instinctive response to being attacked by a dog, given an order that led him to roll on top of

the dog, and being provided with no opportunity to avoid or end the encounter.  But Jarvela has

not presented clearly established law guaranteeing a suspect's right to be free from any use of force

when the suspect's only resistance has been justifiable or caused by another officer's poor choices.

He has presented law stating that he had the right to be free of the use of force where he was

already subdued and not resisting.  When Trevino used force, Jarvela was resisting, at least

somewhat, and was not subdued.  Therefore, Trevino is entitled to qualified immunity.

### E.  Failure to intervene (Trevino)

Jarvela argues that Trevino failed to intervene when Argo attacked him and Houk struck

him.  Despite Trevino's invocation of qualified immunity, Jarvela cites only a generic standard of

law.  See Resp. to Trevino MSJ at 23–24 (Dkt. 104).  Under that standard, "Generally speaking, a

police officer who fails to act to prevent the use of excessive force may be held liable when (1) the

officer observed or had reason to know that excessive force would be or was being used, and (2)

the officer had both the opportunity and the means to prevent the harm from occurring."  Ontha v.

Rutherford Cnty., Tennessee, 222 F. App'x 498, 506 (6th Cir. 2007) (punctuation modified,

citation omitted).

Jarvela has offered a misleading presentation of the facts:

In this case, Defendant Trevino clearly had the knowledge and opportunity to
intervene on Plaintiff's behalf and chose not to do so.  Here, Defendant Trevino
watched for over a minute as Argo continued to ravage Plaintiff's arm.  (Exhibit A,
Apprehension Video, 06:00-07:22).  Instead of doing anything to intervene,
Defendant Trevino continued to watch as Defendant Houk punched Plaintiff in the
back of the head 7 times while still doing nothing.  Furthermore, rather than step
up and made an honest attempt secure Plaintiff and put an end to Defendant Houk's
attack on Plaintiff, Defendant Trevino merely added the pain of multiple taser
bursts to Plaintiff.

Resp. to Trevino MSJ at 23.

The first two sentences of this paragraph would give the impression that Trevino was

passive for one minute and 22 seconds.  However, Trevino actively engaged at 6:40 in the video

and made an apparent effort to separate Jarvela from Argo.  Whether or not Trevino's response was appropriate, he was not passive.  Importantly, Jarvela himself characterized Trevino's intervention as designed to help end the situation: "I believe Officer Trevino was the only one that was, I feel, like trying to get the dog off me by shooting me with a taser.  I think he was trying to stop it."  Jarvela Dep. at 99 (Dkt. 76-4).

Jarvela  has failed to explain what Trevino should have done and what clearly established law would have put him on alert to take action.  Contrary to Jarvela's conclusory assertions, the video shows that he acted relatively quickly to effectuate the arrest.

### F.  Official capacity claims (Trevino)

Trevino was sued in his official and personal capacities.  Trevino and the Village of Clinton argue that the claims against Trevino in his official capacity are duplicative of the claims against the Village of Clinton and should be dismissed.  Trevino MSJ at 15–16 (citing Leach  v.  Shelby County Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989)).  Jarvela does not respond to this argument, which is correct based on the authorities Trevino cited.  The official capacity claims against Trevino are dismissed accordingly.

### G.  Monell claims (Village of Clinton)

Government bodies such as cities and villages "should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."  City of St. Louis v. Praprotnik, 485 U.S. 112, 122 (1988).  Because Trevino, the Village of Clinton's employee on the scene, did not commit a constitutional violation, Clinton may not be held responsible.

**H. Hayes**

Jarvela also argues that Hayes failed to intervene, focusing exclusively on Hayes's alleged failure to intervene when Trevino used excessive force.  See Resp. to Hayes MSJ at 18–20. However, because Trevino did not use excessive force, there was no constitutionally violative behavior for Hayes to stop.  Furthermore, Trevino's use of force (the two deployments of the taser, and the foot on Jarvela's stomach) occurred within a span of approximately 14 seconds, and Trevino provided no warning that he was planning to use a taser for a second time.  See Houk Video at 6:42–6:56.  Under similar circumstances, Defendants have been found not to have had enough time to perceive the incident and help the victim.  See Burgess v. Fischer, 735 F.3d 462, 475–476 (6th Cir. 2013).  Hayes is granted summary judgment.

**I.  Jarvela's motion to Strike Expert and Expert Report**

Jarvela has filed a motion to strike defense expert Matthew Simpson and his expert report (Dkt. 74).  This motion is granted.

Simpson's report contains three parts.  The first is "Pre-Deployment" information and presents (i) information that is uncontested—the events leading up to Houk's dispatch—and (ii) information that is not established by the report and could easily be established through other evidence—Argo's certification.  Simpson Report at PageID.654 (Dkt. 74-2).  The second section is "Deployment."  Id. at 654–655.  That contains a description that by Simpson's own account is "exclusively" drawn from the Houk Video.  Id. at PageID.654.  The only information Simpson provides that would not be apparent to a juror is the meaning of "packen," "suchen," and "platz." Simpson provides the conventional meaning of these terms as used as dog commands, but nothing specific to Argo or Houk's training.

The third section is "Professional Opinions and Basis for the Opinions." Id. at PageID.655–656. It contains the following four conclusions, purportedly supported by reasons: (i) that Houk made a reasonable decision to use Argo as a locating tool to enhance the safety of the officers; (ii) that giving a pre-deployment warning would not have been reasonable; (iii) that the bite and actions taken were not unreasonable, excessive, or punitive; and (iv) that allowing Argo to hold Jarvela until both of Jarvela's arms could be restrained was reasonable. Id.

Jarvela raises several challenges to Simpson's qualification and reports, some of which are persuasive and some of which are not. He notes that Simpson's expert report is missing a list of publications authored in the last ten years and a list of other cases in which he has testified as an expert during the last four years. Jarvela Mot. to Strike at 8–9 (citing Fed. R. Civ. P. 26(a)(2)(B)). However, Houk has explained that this is because there were no articles or cases to list. See Resp. at 6 (Dkt. 90). Thus, there is no reason to strike the expert report for that reason.

With that said, Simpson's lack of publications and prior expert testimony relates to another of Jarvela's challenges, which is that Simpson is not qualified as an expert. Simpson's resume shows he has relevant accomplishments—an Associate in Arts Degree from Mott Community College and a Bachelor of Science in Criminal Justice–Generalist from Ferris State University. See Simpson Curriculm Vitae at PageID.659 (Dkt. 74-2). Further, he also lists 4,560 training hours since 2001 specifically related to police use of canines, including 80 hours as a trainer or master trainer. Id. at PageID.658. He has also worked in law enforcement continuously since February 1991, with about two decades of experience as a canine handler. "[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 advisory committee notes. This principle is especially applicable "where an

expert is asked to opine about police behavior."  Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005).  Therefore, the fact that Simpson's expertise is established almost exclusively by his experience is not particularly concerning.

Jarvela is more persuasive in arguing that Simpson has failed to provide thorough and specific explanations for how his opinions were formed. As Thomas explains, expert witnesses must explain how they reach their conclusion and not just ask courts and juries to take their word for it.  Id. at 432.  Simpson provided very little explanation for his conclusions, and none whatsoever that relate to his experience and supposed expertise.  In offering his "reasons" to support these conclusions, Simpson never once refers to his experience or his expertise.  He does not discuss standard police protocols or trainings, such as what factors an officer should or usually does consider when determining whether to use a canine, whether to give a warning, when to command a dog to bite, when to strike a suspect, or when to use a taser.  He merely gives his take on Jarvela and the officers' behavior as shown in the video. This is plainly insufficient. See id. at 432 ("[B]ecause [appellant's expert's] affidavits provide no rationale for his conclusions, appellants are asking that we take their expert's 'word for it.'  We cannot.").

The fact that Simpson offers no explanation of his methodology and no explanation for how he applied that methodology is fatal on its own.  But the problems with his report do not end there.  Each of the four conclusions he reaches is about the reasonableness of the officers' use of force under the circumstances—legal conclusions about the application of the Graham factors that an expert is not allowed to provide.  See DeMerrell v. City of Cheboygan, 206 F. App'x 418, 426 (6th Cir. 2006).

Houk concedes that Simpson was barred from offering legal conclusions but argues that Simpson's opinions are not legal conclusions. These opinions embrace the following: (i)  Houk

was using his dog as a tracking and locating tool rather than as a seizure tool, (ii) using the dog as a locating tool was done to enhance the safety of the officers and increase the likelihood of apprehension, and (iii) Houk had no intention of having Argo bite at the time he first encountered Jarvela.  Resp. at 4, 6–8, 11–12.  To the extent Simpson provided any reason at all for reaching these conclusions, the reason is that Houk commanded Argo "to suchen (track)."  Simpson Report at PageID.655.  But he does not explain why this command is probative of an intent to have  Argo only track Jarvela—and not also attack him—which would be particularly relevant in a case where Argo tracked Jarvela and ultimately attacked him.

Furthermore, evidence of record contradicts Simpson's unevidenced statement that Argo was being used at a locating tool, rather than a seizure tool, and his inference from the word "suchen" that Houk did not intend to have Argo bite Jarvela.  As noted above, Houk testified that unless Argo was separated from the suspect by a physical barrier, he was trained to find and bite a suspect he was commanded to track.  Houk Dep. at 33–34.  From Houk's testimony, the line between tracking and attacking appears extremely faint, if such a line exists at all.  Expert testimony could be potentially helpful in clarifying what a dog with Argo's training would be expected to do in response to the situation Argo faced and in response to Houk's commands.  The problem is that Simpson, who did not even bother to read Houk's deposition, provided nothing of the sort.  See Simpson Report at PageID.656 (noting that Simpson reviewed the Houk Video and the written reports of Trevino and Houk).  While the application of expertise and experience to the facts of this case would potentially be useful, what Simpson has actually presented is useless.

The parties further dispute whether it is permissible for Simpson to recapitulate the contents of a video that the jury will be able to see itself.  A case Defendants cite is sensible on this point and reasonably consistent with the cases Jarvela offered: "Merely offering general observations on

37

what this video shows without any accompanying expert gloss or explanation would not assist the trier of fact, because the straight-forward act of observing video footage and ascertaining what it shows . . . is within the common experience of the average citizen." <u>Jackson v. Catanzariti</u>, No. 6:12-CV-113, 2019 WL 2098991, at *9 (S.D. Ga. May 14, 2019). Defendants cite this case for the converse it arguably implies: that expert testimony is useful and admissible if it contains "expert gloss or explanation." <u>See</u> Resp. at 13. However, the only gloss Simpson added was his translation of dog-command German, which is available from numerous other witnesses and is of de minimis value. As with the expert excluded in <u>Jackson</u>, Simpson, "does not connect his observation from the . . . video to his . . . experience and expertise such that his proposed testimony would be helpful to the trier of fact." <u>Id.</u>

Simpson's report is struck, and Simpson is struck as an expert.

### J.   Defendants' motion to exclude expert testimony

Defendants have moved to exclude expert testimony and strike untimely disclosures (Dkt. 80).[11] Of the 134 potential expert witnesses at issue, all but five can be excluded based on the agreements of the parties or a very straightforward application of Federal Rule of Civil Procedure 26(a)(2)(C). This leaves five experts in dispute: Drs. Calabria, Sotelo, Cutter, Perry, and Gray. Calabria must be struck as an expert because his disclosure as an expert witness was impermissibly late. The disclosures of Gray and Perry do not articulate any opinion to which those witnesses might testify, and they are struck as expert witnesses. The disclosures of Cutter and Perry articulate opinions and reasons behind those opinions, and they are, therefore, permitted to testify as to those opinions. Accordingly, Defendants' motion is granted in part and denied in part.

---

[11] Trevino and the Village of Clinton filed a notice of joinder/concurrence in this motion (Dkt. 88). The Court will refer to this motion as a motion by "Defendants" generically.

### 1. Background

The case management and scheduling order set Jarvela's deadline for providing his expert witness list, disclosures, and reports as March 31, 2020.  See CMO at 1 (Dkt. 35).  Discovery was set to close on July 31, 2020, and motions to exclude expert testimony were due August 31, 2020, the same day dispositive motions were due.  Id.  By stipulated order entered April 1, 2020 (Dkt. 61), the parties agreed that Jarvela's expert disclosure and report deadline would be extended until May 15, 2020, and Defendants' deadline would be extended until June 15, 2020.

On March 31, 2020, Jarvela served his "Initial Expert Disclosures" via email (Dkt. 80-1). On July 29, 2020, Jarvela served his "First Amended Expert Disclosures," without having sought leave of the Court to do so (Dkt. 80-2).  On July 30, 2020, Jarvela filed a motion to adjourn the discovery cutoff and subsequent scheduling order dates by 60 days.  See Mot. to Extend Discovery ¶ 15 (Dkt. 66).  Among numerous issues purportedly establishing good cause for the extension, the motion stated that Jarvela informed his counsel on July 15, 2020 that he had been treated at the emergency room at Promedica Herrick Hospital in Tecumseh, Michigan because "he was experiencing issues with his arm where Defendant Houk's police dog bit him."  Id. ¶ 12.  The motion further noted that Jarvela had seen or would soon see a specialist, orthopedic surgeon Dr. Diment, and that medical records would need to be obtained and possible additional discovery might need to be undertaken.  Id.  The motion was granted in part, setting the discovery deadline as October 1, 2020 and the deadline for dispositive and expert-related motions as October 15, 2020, and stating explicitly that "[a]ll other dates in the schedule remain unchanged."  8/26/2020 Order (Dkt. 69).

### 2.   Preliminary issues

In his response, Jarvela explicitly states that he does not intend to call or otherwise use as an expert Diment or Dr. Polsky.  See Resp. at 9, 11 (Dkt. 91).  Those witnesses shall not be called.

Furthermore, the disclosures list some 127 doctors and other health professionals who worked at either Promedica Herrick Hospital or University of Michigan Health System, where Jarvela has been treated, and who are identified only by name and degree or licensure status (i.e., MD, MSW, RN, etc.).  It is unclear whether Jarvela has any intention of calling any of those witnesses.  He claims that "out of an abundance of caution and thoroughness, Plaintiff's Initial Expert Disclosures and his First Amended Disclosures listed all of the medical professionals who in some way attended to Plaintiff's medical needs, especially in the hospital setting, but narrowed the field when disclosing the information required by FRCP 26(a)(2)(C)(i)-(ii)."  Resp. at 13.  The reason this statement is unclear is that the amended disclosures still list the healthcare professionals, casting doubt on whether Jarvela actually narrowed the field.  But regardless, they cannot be called, because the disclosures were insufficient.  "With regard to experts not retained or specially employed to provide expert testimony in a case, e.g., treating doctors, the mere disclosure of the expert's identity is insufficient."  Ogle v. Koorsen Fire & Sec., Inc., 336 F. Supp. 3d 874, 877 (S.D. Ohio 2018).  None of the 127 expert witnesses listed only by name or name and degree/licensure may be called as exerts.

### 3.   The late disclosure of Dr. Calabria

Expert witnesses must be disclosed pursuant to Rule 26(a)(2).  That rule provides a deadline for such disclosures "[a]bsent a stipulation or a court order."  Fed. R. Civ. P. 26(a)(2)(D). In this case, as discussed above, the case management and scheduling order, as amended by stipulated order, set a May 15, 2020 deadline, and Calabria was not disclosed until July 29, 2020.

"If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts in the Sixth Circuit must consider the following five factors in evaluating whether an omitted or late disclosure is substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Howe v. City of Akron, 801 F.3d 718, 748 (6th Cir. 2015).

Jarvela argues that the late disclosure of Calabria would not have surprised Defendants and that any surprise could easily have been cured, because Jarvela had previously been treated at Promedica Herrick Hospital, where Calabria treated him, and because Defendants possessed a signed medical release permitting them to obtain the July 14, 2020 medical records. See Resp. at 20. Furthermore, he argues that Defendants had sufficient time to obtain records or depose Calabria due to the discovery deadline extension and the amount of time remaining before trial. Id. at 21. Next, Jarvela argues that the evidence is important because it relates to the ongoing nature of Jarvela's injuries, which are important to the question damages. Id. Finally, he argues that he disclosed Calabria soon after the additional treatment was received, making the late disclosure justified and harmless. Id. at 22.

Defendants reply by arguing that the release was no longer valid, because it was signed on December 18, 2020 and was valid "from 1989 to present." See Herrick Memorial Hospital Release (Dkt. 97-1). Furthermore, Defendants argue that despite the fact that the amended disclosure list stated that Calabria's records would be provided to Defendants as soon as Jarvela received them,

41

the records were never provided.  Reply at 5.  They also claim that producing the records would not have satisfied the disclosure requirements of Rule 26(a)(2)(C).  Id.

Jarvela's untimely amended disclosure must be rejected because of the utter lack of diligence Jarvela showed.  He never sought concurrence for a stipulated order to allow for an amended expert witness list, and to date, he still has not filed a motion to amend the witness list. Jarvela argues that Defendants "never objected to these disclosures until they filed the instant Motion."  Resp. at 19.  But Jarvela does not explain why the burden was on Defendants to object. Had Jarvela filed a motion, then Defendants would have been able to object by way of a response brief.  Instead, Defendants were the ones who ultimately filed a motion—this motion, which was timely filed pursuant to the scheduling order's deadline for filing motions to limit/exclude expert testimony.  Furthermore, the surprise would not have been easy to cure.  Jarvela listed approximately 133 physicians, leaving Defendants to guess which witnesses needed to be deposed and whether Defendants needed to call any rebuttal experts.  While some physicians' potential testimony was described in somewhat greater detail, those descriptions were exceedingly generic, as discussed below.  Thus, even for the limited set of doctors whose opinions might actually be used in the case, Jarvela made it extremely difficult to determine whose opinions really mattered.

Furthermore, Calabria's disclosure was not accompanied by any medical records or other evidence to support the opinions to which Calabria would supposedly testify: that scar tissue from the bite likely formed around or a near a nerve in his right arm, that the scar tissue causes inflammation of that nerve when the right arm is used, and that the appropriate diagnosis was paresthesia of the right arm.  Pl. 1st. Am. Disclosures at PageID.1219–1220.  Without knowing the basis for the expert's opinion, Defendants again lacked sufficient information to determine whether a deposition or rebuttal testimony would be justified.  Jarvela's lack of diligence could

only be deemed harmless in a scenario where Defendants had unlimited time and resources to do Jarvela's job for him.  This is not such a scenario.

Therefore, Calabria must be excluded from testifying based on the late disclosure.

### 4.  The sufficiency of the disclosures

Rule 26(a)(2)(B) discusses the requirements for witnesses who must provide a written report.  None of Jarvela's experts has submitted a written report, as he acknowledges.  Resp. at 14. However, "Rule 26(a)(2)(B) by its terms provides that a party needs to file an expert report from a treating physician only if that physician was 'retained or specially employed to provide expert testimony.'"  <u>Fielden v. CSX Transp., Inc.</u>, 482 F.3d 866, 869 (6th Cir. 2007), <u>as amended on denial of reh'g and reh'g en banc</u> (July 2, 2007).  Treating physicians may testify as experts pursuant to Rule 26(a)(2)(C), which requires the following disclosures for witnesses who do not provide a written report: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

The 2010 advisory committee notes to Rule 26 states:

> Rule 26(a)(2)(C) is added to mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions.  This disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B).  Courts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have.

Fed. R. Civ. P. 26 2010 advisory committee notes.

Defendants submit that the following standard applies:

> A summary of opinions under Rule 26(a)(2)(C) means a brief account of the main opinions of the expert, and that the opinions must state a view or judgment regarding a matter that affects the outcome of the case. A mere statement of the topics of the opinions is insufficient. Further, . . . a summary of facts supporting those opinions under Rule 26(a)(2)(C) means a brief account of facts—only those

on which the expert actually relied in forming his or her opinions—that states the main points derived from a larger body of information; merely stating the topic matters of facts relied upon does not suffice. Similarly, it does not suffice to reference large bodies of material as sources of facts, without stating a brief account of the main points from those large bodies of material on which the expert relies.

Little Hocking Water Ass'n, Inc. v. E.I. DuPont de Nemours & Co., No. 2:09-CV-1081, 2015 WL 1105840, at *9 (S.D. Ohio Mar. 11, 2015); accord Dobbins v. Greyhound Lines, Inc., 336 F.R.D. 144, 147 (E.D. Mich. 2020).

Jarvela does not directly dispute this standard. The case he cites, Fed. Ins. Co. v. Benchmark Bank, No. 2:17-CV-00135, 2019 WL 1317857, at *3 (S.D. Ohio Mar. 22, 2019), in fact cites Little Hocking.

Each of the remaining expert disclosures is analyzed against this standard.

### a. Dr. Sotelo

The disclosure of Dr. Sotelo is as follows:

Plaintiff's care at Promedica Herrick Hospital on August 19, 2017,was overseen by Dr. Carlos A. Sotelo, DO. Dr. Sotelo performed a physical examination of Plaintiff and ordered CT scans of Plaintiff's brain, cervical spine, chest, abdomen, and pelvis, which each showed normal appearance for each region. Dr. Sotelo ultimately decided to transfer Plaintiff to University of Michigan Hospital in Ann Abor because he determined that the care that Plaintiff needed exceeded what could be provided to him at Promedica Herrick Hospital. The relevant medical records from Promedica Herrick Hospital have been attached hereto as Exhibit B.

If Plaintiff were to call on Dr. Sotelo to testify in this matter, he would be expected to testify consistent with his training, experience, and medical records regarding his assessment and treatment of Plaintiff's injuries from the subject incident. Dr. Sotelo would also be expected to testify as to any observations, conclusions, diagnoses, prognoses or other information regarding Plaintiff's injuries from the subject incident. He would also be expected to testify as to Plaintiff's physical condition at the time that Plaintiff left his care for the purpose of being transferred to University of Michigan Hospital Ann Arbor, as well as the reasons for same.

Pl. Initial Disclosures at PageID.1035–1036 (Dkt. 80-1).

The second paragraph of this disclosure is insufficient, because it fails to articulate any expert opinion. It is the equivalent of saying that witnesses will testify about what they saw and heard. This paragraph of the disclosure provides no information about the opinion the witness would offer; it could be used for any treating physician in any case. So it is worthless as a disclosure, because it fails to put the opposing party on notice of what the physician's opinion is, how that opinion is justified, and where that opinion fits into the case. "While disclosures made under subsection (C) are considerably less extensive than a full expert report; to guard against the prejudice of unfair surprise on opposing parties, and for Rule 26(a)(2)(C) to have any meaning, summary disclosures must contain more than a passing reference to the care a treating physician provided." Gleed v. AT&T Servs., Inc., No. 13-12479, 2016 WL 1451532, at *5 (E.D. Mich. Apr. 12, 2016). This aspect of the disclosure contains nothing more than passing references to the care provided; it is insufficient.

With that said, the first paragraph of the disclosure contains two opinions: (i) that CT scans of Jarvela's brain, cervical spine, chest, abdomen, and pelvis, each showed normal appearance for each region; and (ii) that Jarvela's injuries exceeded the care that Sotelo could provide at Promedica Herrick Hospital. In both cases, the opinion in the summary is justified by the medical records. See Promedica Herrick Hospital Records at PageID.1057 (Dkt. 80-1) (discussing the CT scans); id. at 1059 (stating that the reason for transfer is "Patient Requires a Higher Level of Care/Diagnostic Services or Specialty Consult."). Sotelo is not barred from testifying to those two opinions, but he is barred from testifying to any other opinions, because Jarvela's notice failed to articulate any other opinions to which he might testify.

### b. Dr. Cutter

The disclosure of Dr. Cutter is as follows:

Dr. Christina Marie Cutter, MD was the resident physician assigned to provide medical services to Plaintiff on August 19, 2017. Dr. Cutter was being overseen by Dr. Marcia Andrea Perry, MD at the time that she provided services to Plaintiff. Dr. Cutter performed a physical examination of Plaintiff, reviewed the scans performed at Promedica Herrick Hospital, and ordered additional x-rays and CT images to be taken specifically of Plaintiff's right upper arm. After determining that there was no fracture in Plaintiff's right arm and that there were no foreign bodies present in the large laceration located on Plaintiff's right bicep, she performed the procedure to close the laceration on Plaintiff's bicep using 25 sutures. The relevant medical records from University of Michigan Ann Arbor have been attached hereto as Exhibit C.

If Dr. Cutter were to be called to testify, it would be expected that she would testify consistent with her training, experience, and the relevant medical records regarding her assessment and treatment of Plaintiff's injuries from the subject incident. Dr. Cutter would also be expected to testify as her analysis of Plaintiff's injuries, and any observations, diagnoses, prognoses, or causation regarding same.

Pl. Initial Disclosures at PageID.1039.

The second paragraph fails to place Defendants on notice of any opinions Cutter might provide and is insufficient for the same reasons stated above as to Sotelo's opinion. However, Cutter's medical opinions that "there was no fracture in Plaintiff's right arm and that there were no foreign bodies present in the large laceration located on Plaintiff's right bicep" are justified by the medical records provided. See Univ. of Mich. Records at PageID.1132 (Dkt. 80-1). She may testify as to those opinions, but no others.

### c.  Dr. Perry

The disclosure of Dr. Perry is as follows:

Marcia Andrea Perry, MD Dr. Marcia Andrea Perry, MD was Plaintiff's attending physician, and provided supervision to Dr. Christina Maria Cutter, MD. It seems that Dr. Perry was involved in performed a physical examination of Plaintiff and his injuries, a review of the scans performed both at Promedica Herrick Hospital as well as University of Michigan Hospital Ann Arbor. Dr. Perry also consulted with doctors from the orthopedics department prior to the closing of the wound. Dr. Perry observed Dr. Cutter's procedure in closing the large laceration on Plaintiff's bicep using 25 sutures.

If Dr. Perry were to be called to testify, she would be expected to testify regarding the treatment provided to Plaintiff by herself as well as by Dr. Cutter regarding Plaintiff and his injuries from the subject incident.  Dr. Perry would also be

46

expected to testify regarding the nature of Plaintiff's injuries from the subject incident consistent with her training, experience, and records regarding same. Dr. Perry would also be expected to testify as to any observations, diagnoses, prognoses, and causation for Plaintiff's injuries from the subject incident.

Pl. Initial Disclosures at PageID.1039–1040.

This disclosure does not put Defendants on notice as to any opinions to which Perry might testify; accordingly she is struck as an expert.

### d. Dr. Gray

The disclosure of Dr. Gray is as follows:

Dr. Gary Gray is a physical therapist, and Plaintiff met with him and/or his staff on two occasions following the subject incident. Dr. Gray showed Plaintiff some exercises that he could do to improve function in Plaintiff's arm.

If Dr. Gray were to be called to testify, he would be expected to testify regarding his treatment of Plaintiff consistent with his records and recollection of same. He would also be expected to testify regarding the nature of Plaintiff's injuries from the subject incident consistent with his training and experience as well as any observations, diagnoses, prognoses and causation for Plaintiff's injuries.

Pl. Initial Disclosures at PageID.1041.

This disclosure does not put Defendants on notice as to any opinions to which Perry might testify; accordingly she is struck as an expert.

In sum, Sotelo and Cutter may provide expert testimony in accordance with the limitations specified above. The remainder of Jarvela's treating physicians are struck as expert witnesses. Defendants' motion is granted in part and denied apart accordingly.

### IV.   CONCLUSION

For the reasons stated above, Houk's motion for summary judgment (Dkt. 81) is denied with respect to the excessive force claim and granted in all other respects. Washtenaw County's motion for summary judgment (Dkt. 81) is granted. Hayes's motion for summary judgment (Dkt. 78) is granted. Trevino and the Village of Clinton's motion for summary judgment (Dkt. 76) is

granted.  Jarvela's motion to strike expert and expert report (Dkt. 74) is granted.  Houk and Washtenaw County's motion to exclude expert testimony (Dkt. 80) is granted in part and denied in part.

SO ORDERED.

Dated:  August 2, 2021                                       s/Mark A. Goldsmith
      Detroit, Michigan                              MARK A. GOLDSMITH
                                              United States District Judge